1           **UNITED STATES DISTRICT COURT**

2           **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                  - - - - - - -

5    LESLIE STANO, et al.,                )
                                          )
6              Plaintiffs,                )
                                          )
7         vs.                             ) No. SACV 12-0088 DOC
                                          )      Item No. 3
8    IPC INTERNATIONAL CORPORATION,       )
     etc., et al.,                        )
9                                         )
               Defendants.                )
10   _____  )

11

12

13

14           REPORTER'S TRANSCRIPT OF PROCEEDINGS

15          Hearing on Motions re Class Certification

16                 Santa Ana, California

17               Monday, November 5, 2012

18

19

20

21   Debbie Gale, CSR 9472, RPR, CCRR
     Federal Official Court Reporter
22   United States District Court
     411 West 4th Street, Room 1-053
23   Santa Ana, California 92701
     (714) 558-8141
24

25   12cv0088 Stano 2012-11-05 Item 3

1    **APPEARANCES OF COUNSEL:**

2

     FOR PLAINTIFFS LESLIE STANO, ET AL.:

3

4            ZIAEE LAW
             BY:  Rana S. Ziaee
5                 Attorney at Law
             620 Newport Center Drive
6            Suite 1100
             Newport Beach, California 92660
7            949-544-1260

8            -AND-

9            KANI LAW GROUP
             BY:  Nina Kani
10                Attorney at Law
             895 Dove Street
11           Suite 300
             Newport Beach, California 92660
12           949-955-4994

13

14
     FOR DEFENDANT IPC INTERNATIONAL CORPORATION, ETC., ET AL.:
15

16           SEYFARTH SHAW LLP
             BY:  Catherine M. Dacre
17                Attorney at Law
             560 Mission Street
18           31st Floor
             San Francisco, California 94105
19           415-397-2823

20           -AND-

21           MORRIS POLICH AND PURDY LLP
             BY:  Scott A. Freedman
22                Attorney at Law
             1055 West Seventh Street
23           24th Floor
             Los Angeles, California 90017
24           213-891-9100

25

1                          **I N D E X**

2       **PROCEEDINGS**                                **PAGE**

3       Hearing on motions re class certification        4

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**SANTA ANA, CALIFORNIA, MONDAY, NOVEMBER 5, 2012**

**Item No. 3**

(9:27 a.m.)

09:27  THE COURT:  Stano v. IPC.

09:27  And your appearances, please.

09:27  MS. ZIAEE:  Good morning, Your Honor.  Rana Ziaee for the plaintiffs.

09:27  THE COURT:  Pleasure.

09:27  MS. KANI:  Good morning, Your Honor.  Nina Kani for plaintiffs.

09:27  THE COURT:  All right.  Thank you.

09:27  Counsel.

09:27  MS. DACRE:  Good morning, Your Honor.  Catherine Dacre for IPC.

09:27  THE COURT:  Pleasure.

09:27  MR. FREEDMAN:  Good morning, Your Honor.  Scott Freedman, also.

09:27  THE COURT:  I have a series of questions for both parties, then I'll provide you a brief opportunity to add anything not contained in the already voluminous briefs. And after this hearing this morning, I'm going to take this matter under submission and rule on them later in the day, perhaps as late as tomorrow.

09:27  To guide you today, I'm going to note that I'm inclined to do the following:

09:27    1          First, I'm inclined to grant class certification

2   as to the statewide class on the meal and rest breaks based

3   on a common policy outlined in the policy manual, and the

4   common legal question and answer the policy raises as to

5   whether, for example, the class was relieved of all duties

6   during the meal breaks, as required under *Brinker*.

09:28    7          The rounding claim is not likely to be granted

8   statewide certification, and I have serious doubts that this

9   is viable for certification for a Fashion Island class

10   alone.  The claim for duties required to be performed

11   outside the compensated hours is not likely to be certified;

12   but if you wish to add anything new to your arguments, you

13   may take those moments today.

09:28    14          Concerning the two motions to strike, I intend to

15   make the following rulings:

09:28    16          First, I intend to strike defendant's compendium

17   of employee declarations for violating Federal Rule of Civil

18   Procedure 26(a)(1)(A), as the Court does not believe

19   defendant's failure to provide any contact information is

20   substantially justified or harmless.

09:28    21          I will not strike part of plaintiffs' evidence

22   submitted late in support of certification, as the prejudice

23   to defendant from filings that were, at most, 18 minutes

24   late is minimal.

09:29    25          Next, in both rulings, the Court's concern here is

1   the prejudice to each party by the alleged violation.

2   Defendant's Rule 26 disclosures appear to have never been

3   complied with -- or to have never complied with that rule

4   because the initial disclosure did not name witnesses and

5   much less provide contact information.  The supplemental

6   disclosures of employee witnesses have names, but those

7   disclosures still do not provide contact information.  And

8   they were filed so close to the motion date that plaintiff

9   suffered prejudice by being unable to contact and interview

10  those employees.

09:29   11      Finally, the parties stipulated several months ago

12  to an amended complaint that makes no meaningful change to

13  the original.  And for the purposes of class certification,

14  it appears that stipulation was never signed; therefore, the

15  Court will sign that stipulation, and make clear that this

16  is the operative complaint.

09:29   17      So, for the plaintiffs, these are the following

18  questions that I'd like you to address:

09:30   19      First, in a few moments, address your claim that

20  the proposed classes, with your clarification of -- well,

21  I'm sorry.

09:30   22      Please address your claim -- or the defendant's

23  claim -- I'm sorry -- that the proposed classes, with your

24  clarification of whether -- well, whether excluding anyone

25  who's ever been a supervisor for the four-year period would

1   either exclude Plaintiff Stano because she served as a

2   supervisor for part of that period; or second, if the

3   clarification only excludes someone who was a supervisor

4   throughout the entire period.

09:30   5       The class would include Pablo Salcido, because

6   Salcido was a security guard at one point in the proposed

7   period.

09:30   8       So the question, I think, is because plaintiffs'

9   proposed class definitions have changed, I think, I want to

10  know precisely what classes you seek and what you think a

11  most workable definition is.

09:30   12      Second, I'm not inclined to find in defendant's

13  favor on the adequacy argument; though, I'm concerned with

14  the late timing of the 30(b)(6) deposition.  So I want to

15  ask you, are you planning to associate more experienced

16  counsel if certification is granted on the meal and rest

17  breaks?

09:31   18      Second, does the common answer to rounding claims

19  depend on the existence of a seven-minute rounding rule?

20  How can "Joe Z," who oversees only Southern California

21  properties, confirm the seven-minute rule's applications

22  statewide?

09:31   23      A housekeeping matter:  We did not find the

24  correct deposition exhibit pages in support of the claim

25  that the Fashion Island class is at least 51 people.  This

1    could be an error, so please check and either file those

2    pages promptly or notify the Court of whether they appear in

3    the existing exhibits.  For clarification, I want you to

4    spell out which claims are derivative of which allegation.

09:31   5         I take the three allegations to be meal and rest

6    break violations in proper rounding, and requiring work off

7    the clock.  But I want to be certain that those are paired

8    with the correct derivative labor and business and

9    professional code claims.

09:32  10         For the defendants, I have four or five questions

11   also.  Please address when you informed plaintiff that you

12   would file a motion to deny certification.

09:32  13         Second, in your adequacy argument as to plaintiff

14   Stano's sexual harassment lawsuit, as her supervisor,

15   Mr. Salcido, or Plaintiff Shu's claim against Salcido, I'd

16   like you to elaborate on what exactly is the practical

17   conflict of interest that might result.

09:32  18         Third, regardless of the mechanism by which guards

19   record their hours, doesn't the time that a guard records

20   his clock-in or clock-out time always get rounded at all IPC

21   properties in California?

09:32  22         Fourth, I find this policy manual language, quote,

23   "officers are to remain available to respond to calls at all

24   times while on duty on Center Property, even during meal and

25   rest breaks," to be a clear common issue for classwide

1    resolution, and the Hamilton Declaration makes clear the

2    policy applies statewide.

09:33    3         Though merits inquiries are generally not

4    appropriate at this stage, both parties contest the

5    interpretation.  The meaning seems clear that, quote, "even

6    during meal and rest breaks," means an officer must always

7    be available to respond because he or she is still on duty

8    when on his or her meal break.

09:33    9         The alternative you propose is that when officers

10   are on their break, they're not necessarily on duty.  And

11   it's only when they happen to be both on duty and on break

12   that they must respond.

09:33    13        The next question I have is, is this summary

14   accurate, and why is your interpretation the more logical

15   one?  Either way, isn't this a common answer to plaintiffs'

16   legal argument?

09:33    17        And finally, you lodged new authority in the form

18   of *See's Candy* case, which dealt with a rounding policy at

19   summary judgment.  If you'd like to address the relevance of

20   the case, you can do so during your argument.

09:33    21        So finally, I'd like an update as to where things

22   stand with the special master who was supposed to be hearing

23   your discovery disputes.

09:34    24        And who was that master again?

09:34    25        MS. KANI:  Joel Grossman, Your Honor.

DEBBIE GALE, U.S. COURT REPORTER

09:34   1                    THE COURT:  Who?

09:34   2                    MS. KANI:  Joel Grossman.

09:34   3                    THE COURT:  Joel Grossman?

09:34   4                    MS. KANI:  Yes.

09:34   5                    THE COURT:  Okay.  Counsel, we'll take a

        6    five-minute break.

09:39   7                *(Proceedings recessed at 9:34 a.m.)*

09:39   8                *(Proceedings resumed at 9:39 a.m.)*

09:40   9                    THE COURT:  All right.  Then, counsel on behalf of

        10   the plaintiffs.

09:40   11                   MS. KANI:  Good morning, Your Honor.

09:40   12                   I will address the questions raised by the Court

        13   in order.  First, the Court requests the definition that

        14   plaintiffs request for the class.

09:40   15                   That definition was presented in plaintiffs'

        16   objection -- or opposition to defendant's motion to deny on

        17   page 24, and would be as follows:

09:40   18                   All current or former employees of Defendant IPC

        19   who worked as security officers at IPC locations throughout

        20   California for the last four years prior to the filing of

        21   this action.  Employees who have held the position of

        22   Supervisor, Assistant Director, Director, or other

        23   management-level positions for the last four years prior to

        24   the filing of this action are excluded from the class.

09:41   25                   Based on this proposed definition, Your Honor,

1    Pablo Salcido, the individual with whom defendant claims

2    there is a potential conflict, would be excluded.

09:41    3         However, the Plaintiff Stano we do not believe

4    would be excluded.  Plaintiff Stano was briefly an Assistant

5    Supervisor, but as her deposition testimony states, she did

6    not, in fact, perform any of the duties of a supervisor

7    during that period of time.  She did not engage in any

8    management-level decision-making or effectuating the

9    policies of the employer on to other security officers.

09:41   10         If I may continue, Your Honor, to the next point.

11   Your Honor requests clarification with regard to the

12   potential for associating in counsel in this case.  With

13   regard to the 30(b)(6) deposition, Your Honor, that is now

14   on calendar.  It was noticed in late September.  However,

15   due to Mr. Hamilton, who is the designated witness for the

16   defendant -- due to his schedule and due to the hurricane,

17   unfortunately, we had to move it out.  It is now scheduled

18   for November 13th.

09:42   19         Whether or not we will associate in counsel,

20   Your Honor, if the Court is inclined to want us to do so, we

21   are certainly open to that.  And we certainly can do that

22   down the road.

09:42   23         With regard to the seven-minute rule, the Court

24   inquired whether that is a necessary part of the analysis

25   for the rounding claim.  It is not.  The necessary policies

1    are written and they're before the Court.

09:42    2         First, it's the declaration of Ken Hamilton, who

3    explains that there is a rounding policy.  Second, there is

4    an attendance policy.  That's Exhibit B to the declaration

5    of Ken Hamilton, which specifically requires that officers

6    arrive early in to work in order to be prepared for active

7    duty.  Those two policies, read together, create a common

8    question as to the lawful application of this rounding

9    policy and whether or not it is neutral.

09:43   10         Now, the question of whether or not it is in fact

11   neutral, it is a merits issue.  Certainly, the seven-minute

12   rule is important as to a motion for summary judgment or

13   trial of this matter, for example, in order to show that, in

14   practice, security officers were unable to clock in more

15   than seven minutes early or more than seven minutes beyond

16   their regular shift.  And certainly, Your Honor, as to the

17   34 properties that Mr. Joe Zderadicka supervises, the

18   seven-minute rule is already in evidence.

09:44   19         The fourth question Your Honor posed is with

20   regard to the numerosity element for the Fashion Island

21   class.  Your Honor is correct that the -- there is no

22   deposition testimony that states there are 51 people in the

23   class.  There are pages and pages and pages of names of

24   individuals all of which together count to 51.

09:44   25         If the record is unclear as to that, Your Honor,

Case 8:12-cv-00088-DOC-RNB   Document 61   Filed 01/10/13   Page 13 of 71   Page ID #:1735
SACV 12-0088 DOC - 11/5/2012 - Item No. 3

13

1  plaintiffs request leave to provide the correct pages of

2  names to indicate that there are 51 employees in the Fashion

3  Island class.  And although that is not a large class, it is

4  sufficient to meet the commonality component of Rule 23 --

5  I'm sorry -- the numerosity component.

6          The Court's final question is as to what claims

7  are derivative.  As to the meal and rest break claim, Labor

8  Code 226, Labor Code 203, Labor Code 204, and Business and

9  Professions Code claims are all derivative of the meal and

10  rest break claim because they result in improper or

11  incorrect late statements, late pay, and also late final

12  rates of -- of wages.

13          Those same claims are also derivative, of course,

14  of the rounding claim because they likewise result in

15  inaccurate wage statements and failure to pay on time.

16          THE COURT:  I don't know that it's going to make a

17  difference, but I think there's an unfair advantage that the

18  defendants have in filing their motion to dismiss.  In other

19  words, you were limited to the briefing pages.  And then the

20  motion to dismiss got filed, which gave the plaintiffs extra

21  argument, in a sense.

22          And if you're disadvantaged in that, then I will

23  rectify that.  I don't think it makes any result, if I go

24  with my tentative ruling on this, frankly, but I want to

25  make sure you're not disadvantaged.

DEBBIE GALE, U.S. COURT REPORTER

09:46  1            Let me hear from the defendants.

09:46  2            MS. KANI:  Thank you, Your Honor.

09:46  3            MS. DACRE:  Thank you, Your Honor.

09:46  4            The Court articulated a common legal question,

5  which is whether the class is relieved of all duty for meal

6  breaks.  This is the same issue that is raised in the

7  reciprocal briefing, in which the issue of being on duty and

8  the issue of being on call are conflated.  They're treated

9  as the same.  And every time someone makes an argument that

10  officers were on duty, they site to something that says

11  officers were on call.

09:47  12            The DLSC is very clear that there is a distinction

13  between these two concepts, which plaintiff actually echoes

14  in her reply brief, showing that the -- an understanding of

15  exactly what our argument is, which is that "on call" means

16  that you have to be paid for your straight time.

09:47  17            DLSC is clear on this:  If employees are relieved

18  of all duty for a break, if they're on call, you've got to

19  pay 'em.  And we understand that.  And, Your Honor, we do

20  pay them.  There's no dispute in this matter.  We fully pay

21  officers for their whole day that they're with us.  We do

22  not have them clock out for meal breaks.

09:48  23            There's the separate issue of being "on duty,"

24  which means you keeping giving them work to do while they

25  are having their break.  And that is what, number one, does

DEBBIE GALE, U.S. COURT REPORTER

1    not happen 99 percent of the time; and, number two, and more

2    importantly, to any extent there's a deprivation from that,

3    that is subject to individualized inquiry.

09:48    4        We have dozens and dozens of officers saying

5    they've never been interrupted "for" a break.  And I'd like

6    to speak to the issue of our declarations being stricken

7    when we talk more about that.  But I think the key issue for

8    this central legal issue to be certified is that it confuses

9    those two concepts.

09:48    10        Our policy calls for officers to be "on call"

11    only, not "on duty," and that is why we pay them.  They are,

12    in fact, relieved of duty unless there is the rare occasion

13    where there's an interruption, in which case, most of the

14    time, they're put right back on a break again after the

15    interruption has cleared.  And, in fact, because we break

16    people so early and often, they're given a break for meal a

17    good hour or more before they actually have to be, such that

18    they're probably returned to service before they would have

19    first come up for the legal limit.  So that's the issue on

20    the common legal question the Court is thinking of

21    certifying on the meal breaks.

09:49    22        On striking the declarations, which we think are

23    important here, we did -- first of all, it starts with the

24    Motion to Compel.  Plaintiffs wanted contact information,

25    and we said, no.  It is not clear they're entitled to us

DEBBIE GALE, U.S. COURT REPORTER

1   hand over everyone's contact information.

09:49   2         In other cases, I have represented defendants

3   in -- I've actually just stipulated to that.  In this case,

4   I thought it was very important not to do that, because in

5   this case we had clear testimony and evidence that

6   plaintiffs had no idea about any violations incurring *(sic)*

7   anywhere outside their own workplace.  And it seemed that

8   they were jumping the gun to a statewide class action with

9   now the slightest showing in support of that.

09:50   10        In addition, defendant is protected in terms of

11  its obligation to protect its employees' privacy rights by

12  having the Court order contact information to be dispersed.

13  We never got there.  We agreed to a special master and

14  plaintiffs did nothing about it from May to September.

15  That's not defendant's fault.  In fact, on a parallel track,

16  defendants did take interviews of class members about full

17  disclosures and signed disclaimers; and when they did so,

18  they supplemented their initial disclosure, not once, but

19  twice.

09:50   20        I will state to this Court, any way the Court

21  would like me to, those interviews were taken very close in

22  time to the time the briefing was due.  And we supplemented

23  our initial disclosures twice, as soon as practicable, after

24  receiving those signed declarations where we disclosed the

25  names to plaintiffs.  Each declaration identifies exactly

| | |
|---|---|
| 1 | where the person works, and they could be contacted through |
| 2 | counsel.  We did not give out their addresses, their |
| 3 | personal home addresses for the same reason that we're |
| 4 | resisting the Motion to Compel, which never came to issue. |
| 5 | If anything, this was a harmless mistake.  This was not |
| 6 | something that was done -- we were trying to be as up-and-up |
| 7 | as we could. |
| 8 | In contrast, the plaintiff's counsel, who |
| 9 | introduced declarations in support of their motion and never |
| 10 | supplemented their initial disclosures -- they never |
| 11 | identified those witnesses to us, and they never shared |
| 12 | those witnesses' contact information.  All of the witnesses, |
| 13 | with the exception of Mary Carmona, who are declarants in |
| 14 | support of their briefing, are former employees.  We do not |
| 15 | have their contact information.  We did not know their |
| 16 | identities until we received the briefs, and we still don't |
| 17 | know their contact information.  So there's -- and we asked |
| 18 | the Court to do the same thing. |
| 19 | So basically, for us, we felt that we disclosed |
| 20 | and were on top of that as quickly as we could be and as |
| 21 | quickly as practicable, and think that an order striking all |
| 22 | that evidence from punitive class members, whose claims are |
| 23 | being sought to be certified, is far too harsh of a result |
| 24 | for this. |
| 25 | Your Honor also asked us to address the practical |

09:51 (line 8)
09:52 (line 19)
09:52 (line 25)

DEBBIE GALE, U.S. COURT REPORTER

1    impact of the other complaints filed or in preliminary steps

2    towards filing by other class members.  Those two are as

3    follows:

09:52
4            Lead class representative Leslie Stano has filed a

5    sexual harassment complaint against her former supervisor,

6    Pablo Salcido, who, in fact, was a class member -- is a

7    punitive class member, was a public safety officer during

8    the class period.  Getting around that 110 days and the

9    revised class description does not cure it, because it only

10   seeks to take out people who were supervisors for the last

11   four years that -- he was not a supervisor for the last four

12   years.  That's exactly why he's actually a punitive class

13   member, because he was a PSO during the class period.

09:53
14           The complaint is salacious and extreme.  It

15   accuses him of sexual assault.  So it not only directly

16   causes antagonism between Mr. Salcido, a punitive class

17   member who plaintiff's counsel are sworn to protect the

18   interests of -- and as referred to in the *Chipoltle* case,

19   this kind of antagonism is recognized as substantial enough

20   to defeat class certification.  But, in addition, by

21   necessity, such a complaint would have to involve witnesses

22   from the Fashion Island workplace, which would all be

23   punitive class members taking sides in this sexual

24   harassment complaint, in addition to being punitive class

25   members in this complaint, and, of course, plaintiffs'

1   counsel being sworn to defend all of their interests.  I

2   think that's an absolutely insurmountable and extreme

3   conflict that precludes class certification.

09:54   4           Similarly, although slightly less extreme, is the

5   DFEH complaint filed by plaintiff -- class representative

6   plaintiff Benny Shu, who claims that Mr. Salcido retaliated

7   against him.  That also puts them at odds.  It puts

8   plaintiffs' counsel at odds with Mr. Salcido, who is -- they

9   seek to have as their client.  And it puts other class

10  members -- because his complaints directly impact the

11  workplace, it puts other punitive class members from Fashion

12  Island as -- directly as witnesses in those conflicts.

09:55   13          The Court also asked me to address the issue of

14  time recording; doesn't it always get rounded.  We've been

15  very clear, in the declaration of the executive vice

16  president, there is a corporate rounding policy that is

17  identical to that discussed in the *See's Candy* case that

18  just came out.  That is a seven-minute rounding policy that

19  has been upheld as legal.  It's simple.  It's neutral on its

20  face.

09:55   21          To the extent we want to talk about other facts

22  and circumstances that made it operate in an unfair way,

23  that is singularly inappropriate for class certification and

24  calls necessarily for individualized evidence from class

25  members as to the way in which that rounding policy's

neutral and legal on its face, as held by the *See's Candy*

case, the federal authorities, and the DLSC; is somehow

nonetheless illegal and violative of California law;

absolutely will have to hear individualized evidence from a

broad spectrum of individual class members from various

locations.

09:56    Excuse me, Your Honor.

09:56    THE COURT:  Take your time.

09:56    Counsel, join in; make sure both of you check your

notes with your co-counsel.  There's no rush.  Okay?

09:56    MS. DACRE:  There was also a reference to somehow

making the round -- neutral rounding policy illegal because

of the attendance policy.  When read hand-in-hand with the

attendance policy, that required officers to arrive early.

I was not surprised to hear this allegation because I read

it many, many times in the brief, that the attendance policy

required officers to arrive early.  And it absolutely does

no such thing.  It's simply a misstatement of the policy.

09:57    Just another comment on the motion to compel that

plaintiff's counsel have not pursued.  Um, that same issue

was addressed -- and this is cited in our brief -- in

*Buckland v. Maxim Health Care* that, um, counsel coming to

court and saying plaintiffs resisted discovery is not

enough.  They have to follow up on their obligations to

pursue such discovery.  And again, that is partly for the

1    protection of defendants who have another legal obligation,

2    perhaps a conflicting one, which is to protect the privacy

3    interests of their own employees and, as such, are entitled

4    to see this through the legal process.  It is not the fault

5    of defendants that plaintiffs made a choice to abandon that

6    pursuit until it was too close to the class certification

7    briefing deadline to obtain any benefit from it.

8              I believe I've addressed -- initially addressed

9    the Court's first questions for counsel for now.

10             MR. FREEDMAN:  Just...?

11             THE COURT:  We can't hear you.  I don't think she

12   needs any clarification.  And if you have anything to add,

13   who's my lead counsel here?

14             Good.  Counsel, consult with your associate

15   counsel there, and then go back to the lectern.  I can hear

16   from one of you.

17             So, Counsel, do you have anything further on the

18   first round?

19             MS. DACRE:  No, Your Honor.

20             THE COURT:  You'll have two opportunities.  So

21   talk amongst yourselves, and we'll come back to you.

22             Same thing, Counsel.  So I invite you back to the

23   lectern.

24             MS. KANI:  One moment, Your Honor.

25             THE COURT:  By the way, the Court has a prior case

1    that its published *Avilez v. Pinkerton*, which covers many of

2    these same issues.  I've struggled with this issue

3    concerning security guards for quite awhile now.

4                MS. DACRE:  We'd like to address that as well,

5    Your Honor --

6                THE COURT:  Yeah, yeah.

7                MS. DACRE:  -- but it's their turn.

8                THE COURT:  Trust me, we struggle with it.

9                If you can distinguish that, it would be

10   helpful -- or your thoughts, including being wrong on that,

11   frankly.  It's a close issue because, of course, the Court's

12   need to pay attention to the type of entity.

13               These broad-sweeping generalizations and the

14   decisions by the Supreme Court are well-taken as a policy

15   for the trial courts, but the individual industry that we're

16   involved in, et cetera, also needs a close look, and the

17   proclivities of that individualism.

18               Now, Counsel, please.

19               And have you had enough -- have you two had enough

20   time to talk?

21               MS. ZIAEE:  Yes.  Thank you, Your Honor.

22               MS. KANI:  Yes.

23               THE COURT:  Okay.  Great.  Have you given her wise

24   advice?

25               MS. ZIAEE:  Yes, Your Honor.

| | | |
|---|---|---|
| 10:00 | 1 | THE COURT: Okay. Well, good. |
| 10:00 | 2 | MS. KANI: Your Honor, I will go through the |
| | 3 | points raised by counsel for defendant in order. |
| 10:00 | 4 | Counsel raised the issue, the distinction -- |
| | 5 | Counsel claims that there's confusion on the part of the |
| | 6 | plaintiffs as to the issue of "on duty" versus "on call." |
| 10:00 | 7 | Plaintiffs are not confused by that. That |
| | 8 | distinction has been briefed already by plaintiffs in |
| | 9 | Document 55, plaintiff's reply papers on page 15 and 16, |
| | 10 | with case law, both distinguishing the DLSC opinion letters |
| | 11 | cited by defendant and pointing to California Supreme Court |
| | 12 | case *Brinker*, which specifically makes clear now we need |
| | 13 | three elements in order for a meal break to be deemed off |
| | 14 | duty: |
| 10:00 | 15 | Number one, it has to be 30 minutes in length; |
| 10:00 | 16 | Number two, the employee must be free to leave the |
| | 17 | premises; |
| 10:01 | 18 | And number three, the employee must be free of all |
| | 19 | duty, must not be under the control of the employer. |
| 10:01 | 20 | There is a distinction between the requirement to |
| | 21 | pay premium pay for missed breaks, as opposed to the |
| | 22 | requirement to compensate employees for hours worked. That |
| | 23 | distinction is clearly set forth in *Brinker*. There is no |
| | 24 | confusion on that. |
| 10:01 | 25 | With regard to the DLSC opinion letter cited by |

1    defendant, those opinion letters are distinguishable.

2    Again, I don't know if Your Honor wants to belabor this

3    point, because it has been fully briefed.  The DLSC letter

4    cited by defendant primarily discussed a separate wage order

5    having to do with hospital employees, first of all, and do

6    not discuss the distinction raised in *Brinker*, which is a

7    distinction between paying premium pay and compensating

8    employees for hours worked.

10:01    9    Number two, with regard to the compendium of

10   evidence, defendant raised concerns with regard to the

11   Court's inclination to strike it.

10:02   12    Number one, Counsel suggests that the lack of

13   contact information -- um, that we didn't get contact

14   information in their Rule 26 disclosures, which we are

15   required to receive, is plaintiff's fault because we didn't

16   obtain a decision from the special master.  Well, that's

17   just not the case.  These are separate issues, Your Honor.

10:02   18    We are talking here about 33 employees who

19   purposely injected themselves in this case and they did so

20   voluntarily.  This is not a situation where plaintiffs

21   sought discovery of contact information and defendant said,

22   "No.  Go get me an order."

10:02   23    This is a situation -- it says on the face of

24   these declarations that they were voluntarily given.  Well,

25   if they were voluntarily given, Rule 26 clearly requires a

| | |
|---|---|
| 1 | defendant provide that contact information.  As the Court |
| 2 | already pointed out, that information was not provided. |
| 10:03  3 | In addition, defendant raised confidentiality |
| 4 | issues, um, with regard to releasing confidential -- with |
| 5 | regard to releasing contact information.  First of all, |
| 6 | there is a protective order in this case.  Plaintiff |
| 7 | submitted to that based on defendant's request. |
| 10:03  8 | And secondly, frankly, Your Honor, plaintiff spent |
| 9 | a lot of time attempting to meet and confer on this issue. |
| 10 | We, for example, suggested that we do a Belaire-type privacy |
| 11 | notice procedure.  With regard to employee records, we |
| 12 | suggested that names be redacted.  And again, this is as to |
| 13 | the broader issue of confidentiality, not as to these 33 |
| 14 | employees, who voluntarily injected themselves in the case. |
| 10:03 15 | But as to the broader issue, defendants claim that |
| 16 | they have full control with confidentiality is misguided, |
| 17 | frankly, because they had avenues to get around that.  They |
| 18 | chose not to do so. |
| 10:03 19 | With regard to the declarations of Ron Booth and |
| 20 | Laura Mathis, as we stated in our brief, these were both |
| 21 | former employees of defendant.  Defendant had a means of |
| 22 | getting in contact with those people.  And in addition, if |
| 23 | Your Honor is inclined to grant the motion to strike as to |
| 24 | the compendium of evidence and be consistent, we don't |
| 25 | believe that plaintiffs need those two declarations to |

DEBBIE GALE, U.S. COURT REPORTER

| | |
|---|---|
| 1 | prevail on a motion for class certification in this case. |
| 10:04  2 | Uh, with regard to the issue of conflict, |
| 3 | Your Honor, Pablo Salcido is not a member of the class.  To |
| 4 | the extent there is a conflict, it's not relevant.  He is |
| 5 | not in the class.  Plaintiffs are masters of the definition |
| 6 | of the class.  We defined the class to exclude employees who |
| 7 | have management level, um, supervisory level authority, |
| 8 | particularly, and in part -- in part because there is an |
| 9 | issue. |
| 10:04  10 | These are the same employees that are effectuating |
| 11 | and implementing these unlawful policies.  Well, we don't |
| 12 | want those people in the class, frankly.  And they're not in |
| 13 | the class.  And, as we indicated in our papers, to the |
| 14 | extent there is any ambiguity, we don't intend to include |
| 15 | them.  But if there's any ambiguity, Your Honor has the |
| 16 | discretion to make a small modification to that definition, |
| 17 | and the issue of conflict simply goes away. |
| 10:05  18 | On the issue of the *See's Candy* case, Your Honor, |
| 19 | procedurally that case does not belong in this hearing. |
| 20 | That is a case on summary judgment.  It's not a case on |
| 21 | class certification.  And, in fact, there are several cases |
| 22 | that, um, do grant certification on the issue of rounding. |
| 23 | In particular, I will direct the Court to the Central |
| 24 | District, Judge Tucker's case, *Alonzo v. Maximus, Inc.*, 275 |
| 25 | F.R.D. 513, which specifically stated that the merits of the |

1   rounding policy are not to be decided on certification.

10:06   2        Finally, with regard to defendant's claim that

3   plaintiff sat on their hands and didn't pursue discovery in

4   the case, that's incorrect.  The case that defendant cites,

5   where there was a large delay --

10:06   6        THE COURT:  Well, just a moment.

10:06   7        Maybe the Court may agree with Judge Tucker,

8   generally.  What I'm having difficulty with are the

9   specifics of rounding and the different officers.  So let me

10   give you an example.

10:06   11       I don't think -- subject to defendant's argument,

12   and as indicated in my tentative -- that I'm as concerned

13   about the meal breaks on a, let's say, statewide basis, if I

14   read that policy correctly -- at least for certification

15   purposes.

10:06   16       I'm deeply concerned about the rounding.  And it's

17   not the general statement.  It's the fact that when the

18   Court set 40 as a minimum for class certification, that was

19   a guideline.  That isn't the absolute rule.  The Court's not

20   so inclined to find class certification with every group of

21   40 defendants or more.  It's a general rule.  It's a bottom

22   line.

10:07   23       The second thing is, rounding is perplexing

24   because it can be awfully fact specific.  I'm disinclined to

25   certify a class because rounding is individual.  I may come

10:07

1    in on a particular day.  I may sign in or I may sign out.

2    But I don't know how you sweep seven minutes or five minutes

3    or eight minutes.  That seems a very individualized inquiry.

10:07

4            So then I thought, over the weekend, well, what

5    about, you know, Fashion Island itself?

10:07

6            Well, how about in Nordstrom's up in San

7    Francisco?  If you were the, you know, guarding agency of

8    Nordstrom's, et cetera, how would the Court feel if it

9    didn't certify it, but it certified Fashion Island in terms

10   of rounding, for instance?  Well, I would think, then, if

11   you had the same argument, you'd have a series of small,

12   class action suits throughout the state -- in Stockton,

13   let's say, or Sacramento.  Well, that's rather ridiculous.

10:08

14           So, from my perspective, these seem very

15   individualized.  These rounding issues, although I have no

16   disagreement with Judge Tucker, I do agree about them being

17   fact specific.  And whether I round or not, it depends upon

18   when I'm checking in, who I am.

10:08

19           When I'm checking out, it depends upon the report

20   I write.  There may be some days that I literally walk out

21   the door with a report that is one-second long because

22   nothing happened.  There are other days when, in fact, I may

23   have a series of reports that are lengthy because a robbery

24   was committed on the store premises that took me half an

25   hour or an hour and a half to fill out.  Those are

1    individual, it seems to me, and not subject as much to my

2    concern about class certification.  But anyway, those are

3    some initial thoughts.  Those aren't rulings.  That's why

4    we're having this discussion now.

10:08    5         MS. KANI:  Your Honor, if I may address those

6    points?

10:09    7         With regard to the rounding issue, again on

8    certification, separate and apart from the merits --

10:09    9         THE COURT:  No, no, no.  Now you're quoting

10   Judge Tucker.  We're colleagues.  Okay?  And that's not

11   definitive for me.  I'm telling you my concern about

12   rounding.  If I was you, I'd get into the facts of that,

13   instead of quoting me generalizations.

10:09   14         MS. KANI:  I understand, Your Honor.

10:09   15         THE COURT:  You're going to lose, if you don't.

10:09   16         MS. KANI:  I understand, Your Honor.

10:09   17         THE COURT:  Okay.  All right now.

10:09   18         MS. KANI:  If I may discuss your particular

19   concern as to the individuality of the analysis to determine

20   whether the rounding policy is, in fact, neutral or not

21   neutral.

10:09   22         THE COURT:  And what's my average here in terms of

23   rounding?  In other words, do I have somebody rounding

24   minutes?  Seven minutes?  Or what you're really asking me to

25   do is sweep the board and assume a time and a likeness --

1    commonality, let's say, for want of a better word.  I've got

2    problems with that.  And, by the way, I understand that it

3    makes it difficult for you because the lawsuit's not worth

4    bringing for one defendant in terms of a rounding.  And I

5    understand the policy between class actions.  Maybe these

6    are the very actions that should be heard.

7            So -- but nonetheless, with meal and rest -- or

8    meal breaks, yeah, I think that statewide it seems to me

9    that when I read that policy, they can either pay 'em or

10   give 'em the meal/rest breaks, regardless.

11           With rounding, I've got tremendous problems

12   concerning the individuality of that.  And maybe Fashion

13   Island fits a genre of likeness, but I'm not seeing that in

14   a policy form yet.  And I don't know how to gauge the amount

15   of damages if it flowed; so therefore, it seems to me to be

16   awfully individualized.

17           Now, back to you.

18           MS. KANI:  Thank you, Your Honor.

19           With regard to the rounding policy, number one, we

20   know there is a rounding policy, and it's at seven minutes.

21   So we know that the range of time that employees --

22           THE COURT:  Just a minute.

23           How -- how wide?  Is it statewide?

24           MS. KANI:  Yes, it is.

25           THE COURT:  How do I know that?

DEBBIE GALE, U.S. COURT REPORTER

10:11   1          MS. KANI:  Because Mr. Hamilton indicated in his

2   declaration -- the executive vice president of IPC --

3   indicated in his declaration -- I believe it's Paragraph 8

4   of his declaration -- um, I may be wrong on that.  It may be

5   Paragraph 10.  He states that IPC utilizes a rounding

6   policy.  He gives an example which highlights the point.  If

7   an employee clocks in at 6:55, it automatically rounds up to

8   7:00.  If an employee clocks out 3:05 or even 3:06, it

9   clocks -- it rounds again back up to 3:00.

10:11   10          So even though an employee could potentially work

11   seven minutes before 7:00, seven minutes after 3:00, they're

12   getting paid for 7:00 to 3:00.  And we know --

10:11   13          THE COURT:  Like "off the shelf" time in grocery

14   stores?  In other words, you work 8:00 hours, but we want

15   you to go stock the cans on the shelf with a half hour

16   before you leave.  Well, we don't count that.

10:12   17          MS. KANI:  Exactly.  And that's exactly what the

18   attendance policy says, Your Honor.  And I'll read from the

19   attendance policy.

10:12   20          THE COURT:  We can read.  Just refer us to it.

10:12   21          MS. KANI:  Okay.  It specifically states that

22   officers should come in a few minutes early to prepare for

23   active duty on time.  And, as we fully briefed, officers

24   have to come in early --

10:12   25          THE COURT:  How early?

SACV 12-0088 DOC - 11/5/2012 - Item No. 3

32

| | | |
|---|---|---|
| 10:12 | 1 | MS. KANI:  That will depend, Your Honor.  And |
| | 2 | that's what representative testimony is for. |
| 10:12 | 3 | Representative testimony will provide -- |
| 10:12 | 4 | THE COURT:  By policy, does it say how early?  It |
| | 5 | says you should -- |
| 10:12 | 6 | MS. KANI:  It does not. |
| 10:12 | 7 | THE COURT:  Okay. |
| 10:12 | 8 | -- you should come in a little early -- |
| 10:12 | 9 | MS. KANI:  Yes.  It does not provide a particular |
| | 10 | time. |
| 10:12 | 11 | THE COURT:  Just like you should come in a little |
| | 12 | early to my Court if you're set at 8:30, so you can wait |
| | 13 | till 9:30 'cause I was slow this morning.  Okay.  But -- I |
| | 14 | mean, you know, come in a little early. |
| 10:12 | 15 | MS. KANI:  Yes. |
| 10:12 | 16 | THE COURT:  Okay. |
| 10:12 | 17 | MS. KANI:  And the -- I'm sorry -- the |
| | 18 | declarations and the depositions in the case that we've |
| | 19 | provided show that, on average, the four named plaintiffs |
| | 20 | came in about 10 to 15 minutes early in order to accomplish |
| | 21 | the tasks necessary, to be prepared on time. |
| 10:13 | 22 | And in addition -- in addition, uniformly these |
| | 23 | officers are required to have gear in order to do their |
| | 24 | work -- whether it's a radio, a flashlight, keys.  And it's |
| | 25 | true that different locations have different gear.  But the |

1    point is they all have to wear gear.  And the gear stays at

2    the office.  They have to come in, check out the gear, put

3    it on their body, and then -- and now report to duty.  They

4    can't do the job without that.

10:13    5    THE COURT:  And the difference in that is -- and

6    I'm going to be facetious for a moment -- but when I come to

7    court, I've got gear.  I've got this robe on.  You come to

8    Court in a coat and tie.  The difference is you change at

9    home and come to court.  And, if you were working in my

10    establishment, in a sense, I don't pay you.

10:13    11    But here, the difference you'd argue is that they

12    actually have to put on the uniform.

10:14    13    MS. KANI:  No, Your Honor.  They -- actually, they

14    do have to put on a uniform, but we are not claiming that

15    the time of putting on the uniform is necessarily part of

16    the equation because they are allowed to take that uniform

17    home.  What they're not allowed to take home, however, is

18    the gear.  The gear stays on the property and has to be

19    checked out and put on the body of the officer before

20    beginning active duty.

10:14    21    THE COURT:  Well, that's a rather *de minimis*

22    period of time, isn't it?

10:14    23    MS. KANI:  No.  Actually, it's not, Your Honor.

10:14    24    Based on the declarations and deposition, it's

25    not.  The officers have to check out a variety of different

Case 8:12-cv-00088-DOC-RNB   Document 61   Filed 01/10/13   Page 34 of 71   Page ID #:1756
SACV 12-0088 DOC - 11/5/2012 - Item No. 3

34

1    types of gear.  They have to actually go and check it out on

2    a document.  They have to check that it's working.  They

3    have to put it on.

10:14
4            And beside the point, to the extent that the time

5    may or may not be *de minimus*, that is a merits issue.  At

6    that point we're looking at whether or not there is a common

7    policy for officers to come in early and not get paid for

8    it.  And we know from the attendance policy they got to come

9    in early.  We know from the fact that the gear stays on the

10   property, they've got to come in early to put that on.  We

11   also know that there's a rounding policy that rounds time.

10:15
12           THE COURT:  So what we're really dealing with

13   isn't what I'm going to call "off duty," because they can

14   take it home -- or is it the fact that they've got to check

15   back in the gear also?

10:15
16           MS. KANI:  They do have to check it back in.

10:15
17           THE COURT:  And so, therefore, you're claiming

18   time for coming in and putting on the gear and leaving and

19   taking off the gear.

10:15
20           MS. KANI:  Taking off the gear -- and also,

21   there's an additional requirement at the end of the shift,

22   which is completing reports.

10:15
23           And, Your Honor, to the extent that there are

24   variations -- yes, some people put on gear faster than

25   others.  Of course, some locations might have more gear than

1    others.

10:15    2         THE COURT:  The difficulty I'm having is that I'm

3    inclined to be rather progressive or liberal in terms of

4    class cert when I see, you know, a true time harm.  This,

5    frankly, seems *de minimis* to me.  The reports don't seem

6    necessarily *de minumus*, but they do seem individualized.

10:16    7         But the putting on and taking off of gear seems

8    rather *de minumus* to me.  And I'm not certain I want to

9    change American industry over that, you know, small period

10    of time when it's -- even though it's, quote/unquote,

11    "related to work" 'cause, quite frankly, I don't see too

12    much difference between slipping on a pair of Levis to come

13    to work, and slipping on a coat and tie when I'm required to

14    go to court.  It takes more time, but it's part of what's

15    expected for my employment.

10:16    16         Here, if I'm dealing with minutes, I don't know

17    that that's the kind of class cert, using my discretion,

18    regardless that I'm particularly interested in.  That's what

19    you're hearing as an obstacle from the Court now.  And

20    that's the practical aspect of this, as well.

10:16    21         And I want to be, you know, blunt with you about

22    the record on that so that we're not -- you know, as you

23    argue the law, I'm coming back in the particularization of

24    this industry.

10:17    25         Once again, meal breaks, I think you're right on

1    that.  And I think you're right on the statewide basis.

2    That's the good thing.

10:17    3         On the rounding, I'm a little hesitant on that.

4    And I'm more than hesitant concerning the gear.  'Cause it

5    seems absolutely *de minimus* to me in terms of time.  I've

6    got a problem with that.

10:17    7         Number two, it would seem to me to indicate that

8    the employer would have to literally keep track of -- of

9    minutes.

10:17    10         Now, if you're saying it's 15 minutes every day or

11    30 minutes every day, and you've gotten that in the record,

12    I think that that might be substantial compounded over a

13    period of time.  But when you -- every time I argue that

14    back to you, then you throw in the reports on top of the

15    gear, and I think that those are two separate things.  The

16    reports, I think, are pretty individualized, quite frankly.

10:17    17         But, I'm back to you now.  That's why we're having

18    this discussion.

10:17    19         MS. KANI:  Yes.

10:17    20         Your Honor, with regard to the Court's concern as

21    to the *de minimis* issue, that is defendant's burden.  That's

22    an affirmative defense.

10:18    23         THE COURT:  It's my discretion, though.

10:18    24         MS. KANI:  And, of course, that -- that is true.

25    However, plaintiffs request -- or submit that defendant be

1    allowed to carry their burden.

10:18    2         At this stage, again, we have put in evidence

3    through our own representative testimony, through

4    declarations and depositions that it is not *de minimis*; that

5    it can take 10 to 15 minutes for the officers to do all the

6    things they need to do in order to prepare for active duty

7    on time; and they -- in fact, they -- sometimes even 30

8    minutes past time in order to remove gear and complete

9    reports.  That is real time --

10:18    10        THE COURT:  -- apply to police departments also?

10:18    11        In other words, when Courts set down rules, we set

12    down broad sweeping rules.  People read class certification

13    for precedence.

10:18    14        If I'm a police employees association, putting on

15    gear --

10:18    16        MS. KANI:  Yeah.

10:18    17        THE COURT:  -- taking off gear, I should get paid

18    for it, shouldn't I?

10:19    19        MS. KANI:  Yes.  They probably are being paid.

20    They should be.

10:19    21        If the Court's referring to donning and doffing

22    cases, that is different.

10:19    23        THE COURT:  Why?

10:19    24        MS. KANI:  But --

10:19    25        THE COURT:  Why?  Why are donning and doffing

| | | |
|---|---|---|
| | 1 | cases different? |
| 10:19 | 2 | MS. KANI:  Well, these are not protective gear, |
| | 3 | Your Honor.  The flashlight, the radios, the badges and the |
| | 4 | keys -- |
| 10:19 | 5 | THE COURT:  Sure they are.  Sure they are.  Aren't |
| | 6 | they?  I mean, badges, keys -- all those give me authority, |
| | 7 | in a sense.  I don't have to have a gun.  That's just one of |
| | 8 | the many things. |
| 10:19 | 9 | Go join counsel.  It's okay.  Come on in here.  I |
| | 10 | want to hear from both of you. |
| 10:19 | 11 | MS. ZIAEE:  Thank you, Your Honor. |
| 10:19 | 12 | Your Honor, this case does differ from the police |
| | 13 | cases involving donning and doffing issue. |
| 10:19 | 14 | THE COURT:  Why? |
| 10:19 | 15 | MS. ZIAEE:  Because this is a situation where the |
| | 16 | employer requires that the employee arrive at the premises, |
| | 17 | at their offices and -- |
| 10:19 | 18 | THE COURT:  Don't police officers have to arrive |
| | 19 | also a little early to get their gear on? |
| 10:20 | 20 | MS. ZIAEE:  Not always.  Actually, oftentimes, in |
| | 21 | those police officer cases, they are donning and doffing at |
| | 22 | home -- |
| 10:20 | 23 | THE COURT:  Just a minute. |
| 10:20 | 24 | MS. ZIAEE:  -- or they're taking their equipment |
| | 25 | home. |

10:20    1          THE COURT:  Just a minute.  They may be.  But

         2    oftentimes it's done in the police department.  And here, I

         3    come in off of patrol.  It's 2:00 o'clock in the morning.

         4    Okay?  I'm tired.  I want to go home --

10:20    5          MS. ZIAEE:  Understood.

10:20    6          THE COURT:  -- and I can't go home until you, at

         7    2:00 o'clock, get out on the street.  And so I expect a

         8    certain amount of, you know, small transition time between

         9    you getting there at 1:55 -- 'cause I'm pretty angry at you

        10    by 2:05, but I want to go home, and we're donning and

        11    doffing.  So there's a little bit of transition time, and

        12    it's a practical matter.  So I hear the broad

        13    generalization.  I get concerned in what I've referred to

        14    and you've referred to as "donning and doffing" cases.  And

        15    the only difference I see here is the private employer.

10:21   16          And that may be a huge distinction by the way.

        17    But, you know, you have to remember, I start thinking this

        18    is a donning and doffing case.  Okay?

10:21   19          So back to you.

10:21   20          MS. ZIAEE:  Okay.  Thank you, Your Honor.

10:21   21          Your Honor, the distinction between the policies

        22    involved with the donning and doffing cases and the case

        23    here is that there isn't a policy that requires, generally,

        24    in those cases, that the officers don and doff at the police

        25    station.  Although, obviously, because of safety issues,

1    they oftentimes do don and doff at the police station.  And

2    I think that's where the ambiguity comes in.

10:21

3            Also, the FLSA covers those cases.  Um, and the

4    requirement for hours worked is different here, but --

10:21

5            THE COURT:  Well, what's the difference, though?

6    I mean, whatever you call it -- "don and doffing" for police

7    officers -- why isn't that analogy equally good here?

10:21

8            This is a *de minimis* period of time, from what I'm

9    seeing on this record, to get a battery, a badge, a shirt

10   on.  And the only difference I see is that, you're right, in

11   many cases, the police can do that at home.  Here, it seems

12   to me that the security guards may be required to do that in

13   the workplace.

10:22

14           MS. ZIAEE:  They're absolutely required to do that

15   there.

10:22

16           THE COURT:  So, therefore, I see that distinction

17   and understand that.  But beyond that, it seems to me, I'm

18   dealing with a minimum period of time.

10:22

19           MS. ZIAEE:  I understand the concerns about the *de*

20   *minimus* rule.  But I would just like to clarify a further

21   distinction.  I mean, here, we have the California Labor

22   Codes controlling.  And the employees don't necessarily need

23   to be performing actual work in order to, um -- in order to

24   be performing compensable work.

10:22

25           Just by simply requiring that the employees be

```
 1   present at the office in order to check out the equipment,
 2   the employees must be compensated under the California Labor
 3   Codes.
 4            Beyond that, the de minimus issue, I understand
 5   it's a concern for Your Honor.  At this point, we do have
 6   representative testimony that it takes putting on the
 7   equipment, taking off the equipment, and also in actually
 8   putting together details, activity reports, and incident
 9   reports.
10            THE COURT:  See, now you've jumped to the reports
11   again.
12            MS. ZIAEE:  Yes.  I'll go back to the donning and
13   doffing, then.
14            Those -- that time is -- is time-consuming; takes
15   about ten minutes.  We don't have any evidence necessarily
16   showing that -- well, we do have the defendant's
17   declarations.  But we do need an opportunity to present
18   those issues on a summary judgment and at trial.  I
19   understand Court's concerns regarding the de minimus rule.
20   But in having --
21            THE COURT:  "Donning and doffing" mean that you
22   and I can have a conversation.  I can come into the
23   workplace.  I haven't seen you in a while.  I chat for a
24   little while.  I go over -- I mean, it takes a small amount
25   of time to get this equipment.  In fact, this equipment --
```

Case 8:12-cv-00088-DOC-RNB  Document 61  Filed 01/10/13  Page 42 of 71  Page ID #:1764
SACV 12-0088 DOC - 11/5/2012 - Item No. 3

42

1    it should be in your locker.

10:24    2    MS. ZIAEE:  It's not, Your Honor.  It's generally

3    at the supervisor's office -- in the office because they're

4    so concerned about the equipment being stolen by their

5    employees.  They're maintained at the supervisor's office

6    where the security officers line up.  They wait in line.

7    Then they have to go through, find the equipment, find the

8    serial number, jot it down -- oftentimes, the equipment is

9    nonfunctioning, so they have to find functioning

10   equipment -- and, at the same time that that's happening,

11   other officers are checking in their equipment.  So there's

12   even more backup in the line.

10:24   13    We believe that, as we move forward --

10:24   14    THE COURT:  And I should certify this statewide?

10:24   15    MS. ZIAEE:  I understand your concerns regarding

16   the de minimus rule.

10:24   17    THE COURT:  I should certify this statewide; is

18   that right?

10:24   19    MS. ZIAEE:  Well, we believe that because of the

20   policy that are at play.  I mean, they're -- the general

21   policy is:  We're gonna round your time, and we're not gonna

22   allow you to clock in before seven minutes, and we're going

23   to make you come here earlier and do work and get your

24   equipment without ever being compensated for it.

10:25   25    THE COURT:  Okay.

10:25   1          MS. ZIAEE:  Um, that's the -- that's the general

2   policy.

10:25   3          And in terms of the *de minimis* rule, we do believe

4   that representative testimony, as it continues to be

5   gathered, and as will be addressed on the motion for summary

6   judgment or at trial, will show that the time spent by the

7   officers was not *de minimus*.

10:25   8          But we do see that as an issue for down the line.

10:25   9          THE COURT:  Thank you.

10:25   10         MS. ZIAEE:  Thank you, Your Honor.

10:25   11         THE COURT:  Anything else?

10:25   12         MS. KANI:  Your Honor, I was going to just raise

13  the last point raised by defendant, which was the *Buckley*

14  case, which defendant cited that -- on the issue of

15  adequacy, and that plaintiffs have not engaged in sufficient

16  discovery.

10:25   17         That -- that case is totally distinguishable from

18  this one.  In that case, the named plaintiff passed away and

19  counsel for plaintiffs just did nothing for six months,

20  didn't find a new class rep, didn't do any discovery,

21  completely abandoned the case.  And in that case, that was

22  found to be egregious.

10:26   23         That is not the case here, so that case does not

24  control.

10:26   25         THE COURT:  Okay.  Let me hear from you, Counsel,

1  on behalf of the defendants.

10:26  2          That's you.

10:26  3          MS. DACRE:  Thank you, Your Honor.

10:26  4          I'll start on the off-the-clock work since that's

5  where we left off.  You heard a lot of testimony from

6  Counsel today.  I'd love the opportunity to cross-examine

7  them.  You are being --

10:26  8          THE COURT:  Counsel, your argument now.

10:26  9          MS. DACRE:  You are not being told evidence that

10  comes from the record.

10:26  11          To the extent that representations were made that

12  were accurate, they are all limited to the scenario at

13  Fashion Island mall.  They have no data whatsoever about any

14  other location.  So the thought that this supports a

15  statewide class -- there's just absolutely no support for

16  it.

10:26  17          Going back to the attendance policy, where we

18  require them to come in early, I think Your Honor's comments

19  were accurate and reflect a real workplace.  But in any

20  event, here's what it says:

10:27  21              "IPC International expects their

22              employees to be prepared to begin active

23              duty in uniform no later than the

24              scheduled time at which their shift

25              begins.  In this interest, it is

DEBBIE GALE, U.S. COURT REPORTER

1           beneficial to arrive a few minutes early

2           to handle any personal details and

3           prepare for active" -- tatrol *(sic)*.

4       How that translates to a requirement to come early

5   and do work for which they are not paid, I am at a complete

6   loss to understand.

7       What you have to look at is IPC's policy, which

8   was set forth in our original motion, our opposition, that

9   says the first thing you do when you get to work is clock

10  in.  And here's a whole bunch of other things we expect you

11  to do to get ready for work.  They all come after clocking

12  in.

13      Apparently, sometimes that didn't really happen.

14  That's not a class certification issue.  That's an

15  individualized issue.  What the policy says is you get here,

16  you clock in, and then we want you to do a bunch of things;

17  included in those is get your gear; included in those, at

18  the end of the day, finish your DAR's.  It's all on the

19  clock.  And then the last thing you do before you leave is

20  clock out.  That's what the policy says.

21      THE COURT:  Let me ask both of you something in

22  just a moment.

23      When I first got the case, I focused on the "meal

24  and wage" issue statewide.  And I focused on the entity

25  known as "IPC."  It didn't mean anything to me.  But as the

```
        1    case started to get narrowed, I started to hear the word
        2    "Fashion Island."
10:28   3             And I want you to check, because I don't know the
        4    relationship between Fashion Island and the agency that they
        5    hire.  And I want to see if I have a potential conflict, or
        6    at least divulge a relationship.  There's a man down there I
        7    think named Carl Alexander.  And I don't know -- I thought
        8    he was employed by Fashion Island itself, not IPC.
10:29   9             And also, a man named Vince Vasil.  Vince Vasil
       10    was my former investigator in murder cases, in homicides in
       11    Orange County.  He then went to work for Disneyland, and
       12    then went to work for Fashion Island.
10:29  13             And I was introduced to a person named Carl
       14    Alexander, oh, 10, 15 years ago.  Fashion Island, itself,
       15    did an immense amount of work for wounded warriors and were
       16    very supportive of the military and some of the wounded
       17    coming back in the different conflicts.  And they've been
       18    very supportive in terms of international judicial training,
       19    but that I always viewed as being Fashion Island, itself,
       20    the Segerstroms and a wonderful son-in-law, Mr. Grant, down
       21    there who brought various contingents of Supreme Court
       22    Justices from Armenia to Georgia into Fashion Island to
       23    entertain them.
10:30  24             I don't know if I'm concerned or not, but it's
       25    dawning on me if that "IPC" is synonomous with Carl
```

|       |    |                                                              |
|-------|----|--------------------------------------------------------------|
|       | 1  | Alexander, then I want to tell you that I know the person.   |
| 10:30 | 2  |         But if IPC is an independent company contracted      |
|       | 3  | to -- by Fashion Island, and has no relationship to Carl     |
|       | 4  | Alexander, then I have no concern.  In other words, there's  |
|       | 5  | no financial or pecuniary benefit whichever way I rule.  It  |
|       | 6  | doesn't affect Fashion Island; it affects this particular    |
|       | 7  | agency.                                                      |
| 10:30 | 8  |         So I tell that to you, not knowing the               |
|       | 9  | relationship between Fashion Island.  All my dealings have   |
|       | 10 | been with Mr. Grant, quite frankly, when he's volunteered,   |
|       | 11 | for instance, to host an international delegation coming to   |
|       | 12 | Orange County.                                               |
| 10:31 | 13 |         Now, you look perplexed, Counsel.  Are you           |
|       | 14 | perplexed?                                                   |
| 10:31 | 15 |         MS. DACRE:  My -- what I wanted to know from the     |
|       | 16 | Court was do you want me to address what I know about that   |
|       | 17 | now?                                                         |
| 10:31 | 18 |         THE COURT:  Yeah.  I'd like you -- just so I feel    |
|       | 19 | comfortable.  I tend -- you know, sometimes it's not what we |
|       | 20 | rule.  We just have to be so careful in my profession to be  |
|       | 21 | absolutely fair.  I don't care if you like my decisions or   |
|       | 22 | not.  I just care mostly that I'm deciding them in a fair    |
|       | 23 | way and there's never any intonation that I know somebody or |
|       | 24 | there's some influence.                                      |
| 10:31 | 25 |         Do you know -- tell me what you know about IPC and   |

|   |   |
|---|---|
| | 1 |

the relationship to Fashion Island.

10:31   2    MS. DACRE:  Yes, Your Honor.

10:31   3    Those two names sound familiar to me.  And I

4    believe they are both people who work for Fashion Island.

10:31   5    THE COURT:  Good.

10:31   6    MS. DACRE:  Fashion Island is the client of IPC.

10:31   7    THE COURT:  Yeah.  Let me stop.

10:31   8    MS. DACRE:  We extend services.

10:31   9    THE COURT:  I do also.  I don't see any

10    relationship between the two, but I just -- I want both of

11    you to just be comfortable with that.  Because every time

12    I've met Mr. Grant, it's been with Carl and Vince Vasil.

10:31   13    And if it was Vince Vasil, I tell you I might have

14    a conflict.  He worked God-awful hours with me on homicides.

10:32   15    Do you have some time for a story?

10:32   16    MS. DACRE:  Yes, Your Honor.

10:32   17    THE COURT:  Good.  Good.  You know I'm just joking

18    with you but...

10:32   19    People commit murder between 10:00 o'clock on

20    Friday night and 3:00 o'clock in the morning, and between

21    11:00 -- they stay out a little later and they like it

22    between 11:00 and 3:00 o'clock, also.  So that means when

23    you've got homicides, you work 24/7 basically, because

24    criminals don't take meal and rest breaks.  They don't check

25    in early or late.  Now I'm just joking with you.

10:32    1        But I worked so closely with Mr. Vasil for so many

2    years that, if he was a particular witness on the matter, I

3    would feel very uncomfortable and would tell you.  Even

4    though I didn't, quote/unquote, have a "legal conflict," I

5    would just be concerned, and would disclose that to you,

6    minimally, and have to go back and think did I want to

7    disqualify myself.

10:32    8        MS. DACRE:  And we would want to do that too,

9    Your Honor.

10:32   10        The only concern I have is this, and I'll just

11   throw it out now.

10:32   12        THE COURT:  Yeah.

10:32   13        MS. DACRE:  The management structure at IPC at

14   Fashion Island is all formerly Fashion Island, and then IPC

15   came in and took over and inherited them, if you will.  So

16   all of those top management people are Fashion Island, may

17   have worked with Vince.

10:33   18        THE COURT:  I'm not concerned about that.

10:33   19        MS. DACRE:  Okay.

10:33   20        THE COURT:  When I'm deciding this -- assume, for

21   instance, on the meal and rest break, you're not doing real

22   well right now.  You're going to convince me that I'm wrong.

23   But I'm probably going to certify that class.  Well, that's

24   a positive for you, and you probably wouldn't care from the

25   plaintiff's side that I had a conflict.  In fact, you'd just

Case 8:12-cv-00088-DOC-RNB  Document 61  Filed 01/10/13  Page 50 of 71  Page ID #:1772
SACV 12-0088 DOC - 11/5/2012 - Item No. 3

50

|     |     |
| --- | --- |
|     | 1   as soon ignore it. |
| 10:33 | 2   From your side, it really doesn't matter 'cause |
|     | 3   I'm actually ruling against, you know, the very entity I |
|     | 4   might have an association with, which apparently I don't. |
| 10:33 | 5   But on the rounding up, you know, you might be |
|     | 6   concerned if they, for instance, were running the office, |
|     | 7   and were being -- and they were checking in and out the |
|     | 8   gear.  My -- my view now is that IPC is a completely |
|     | 9   separate entity that, that structure, if you will, is still, |
|     | 10  if you will, the Southcoast Plaza structure, that they've |
|     | 11  contracted that out.  But I just don't know and I want you |
|     | 12  to check for me.  Okay? |
| 10:34 | 13  MS. DACRE:  Right.  So we would do that. |
| 10:34 | 14  THE COURT:  Now hold on. |
| 10:34 | 15  Let me hear from the plaintiffs. |
| 10:34 | 16  MS. KANI:  I wanted to state for the record that |
|     | 17  our understanding, through investigation of the case, is |
|     | 18  that, as counsel indicated, IPC is a separate entity and has |
|     | 19  a contract to provide security service for Fashion Island. |
| 10:34 | 20  THE COURT:  Okay. |
| 10:34 | 21  MS. KANI:  In addition, through the course of our |
|     | 22  investigation, we have not encountered any of the names that |
|     | 23  Your Honor has identified. |
| 10:34 | 24  THE COURT:  Okay.  I'm comfortable going forward, |
|     | 25  at least at this time, unless I hear differently. |

10:34    1         Okay.  Thank you, Counsel.

10:34    2         MS. DACRE:  Okay.  The last point on the

3   off-the-clock work is regarding the preparation of DAR's,

4   the reports.  Some locations don't even do them.  And even

5   the named plaintiff, Mario Guerrero, said that he -- all of

6   the things he did at the end of his shift were before he

7   clocked out.

10:34    8         THE COURT:  Yeah.  And that's my concern.  I'm

9   going to echo back your argument; and that is, I've got a

10   tremendous difficulty ever certifying this statewide in what

11   I'm going to call "off-the-clock" or "donning and doffing."

12   I just don't know that that isn't an individualist inquiry.

10:35   13         I'm not certain of what the parameters are in

14   Stockton or Nordstrom's -- let say, at a Nordstrom's, if you

15   had that contract, for instance -- or another huge

16   conglomerate in San Francisco.

10:35   17         I'm not too concerned about 52 versus 40.  I think

18   those are bottom levels for class certification.

19   Tentatively, I just -- I really think that that's also

20   extraordinarily *de minimus*.  And I'm not facing here what I

21   call the off-the-shelf that goes on in grocery markets.

22   Those are the situations that would concern a Court when you

23   work eight hours, and on the way out the door, you're

24   required to stock, you know, at 4:00 o'clock in the morning

25   because the truck just came in, and the stocking takes two

Case 8:12-cv-00088-DOC-RNB   Document 61   Filed 01/10/13   Page 52 of 71   Page ID #:1774
SACV 12-0088 DOC - 11/5/2012 - Item No. 3

52

1    hours, and you're not being paid for it -- or an hour or

2    half hour, consistently.  That off-the-shelf causes the

3    Court problems with the grocery chains, for instance.

4            But donning and doffing seems such a *de minimus*

5    period of time.  It's almost immeasurable and very specific.

6    And I really don't want to get into the conversation where I

7    engage you in a conversation, 'cause I'm reading, and it

8    takes ten minutes, and I'm still putting on my shirt in the

9    locker room, as opposed to, I don't know the other gentleman

10   very well, and I'm very efficient.  I put on my shirt and I

11   walk out the door.  I'm dealing with seconds, literally,

12   from my perspective.

13           As far as the reports are concerned, those seem

14   individualized to the Court also.  Most of these reports are

15   quickly done.  They're *de minimus* periods of times.

16           Now, if I've got a robbery and I'm holding you an

17   hour and a half, then I expect the store to be fair, or the

18   entity to be fair.  I expect to get, you know, paid for

19   that.  I don't think that that's commensurate with your

20   duties.  But I'm not seeing that in the record.  And if I,

21   am, it does seem to be individualized because, thank

22   goodness, there aren't that many occasions that take place

23   where reports are required at Southcoast or other

24   establishments.

25           The one big report that they do have, though, is

Case 8:12-cv-00088-DOC-RNB   Document 61   Filed 01/10/13   Page 53 of 71   Page ID #:1775
SACV 12-0088 DOC - 11/5/2012 - Item No. 3

53

1   this:  The occasional smash-and-grab takes place in

2   someplace like South Coast, where you come into a jewelry

3   store -- you know, recently that that occurred -- three

4   gentlemen came in, did a smash-and-grab on the jewelry store

5   down there, took all the diamonds and ran out the door.

10:37   6        It's the car thefts in the auto parking lot that

7   cause the greatest concern.  That is where I might be

8   willing to listen to the time that the report takes --

9   except, at least with Costa Mesa Police Department and

10   South Coast, there's a direct relationship.  When an auto

11   theft goes down, it is so well-guarded and so well-patrolled

12   that the call is being made right then.  It's Costa Mesa

13   that responds basically and takes the report.  It's not

14   South Coast.

10:37   15        So checking out, I would simply say, "Stolen car,

16   Penal Code 496, referred to Costa Mesa Police Department."

17   Where I'd get the report of the stolen car?  Costa Mesa

18   Police Department.  They respond.  It's their jurisdiction.

19   You go down to the police department.  "I arrested Dave

20   Carter.  He's a felon with two prior car thefts.  Questioned

21   him.  He waived his Miranda rights, and confessed" --

22   whatever.  That's where you find the police reports.  You

23   find very little from Southcoast Plaza, which is why, in a

24   robbery or burglary case over in state court, you never see

25   'em.  You never see 'em.  Who you see in court are the

1    responding police agency, because the stores want to turn

2    that authority over as quickly as possible to your local

3    police officers, both for liability and because they have a

4    working relationship.

5           But anyway, continue on, Counsel.

6           MS. DACRE:  Just to that, Your Honor, there's been

7    consistent testimony about a separate issue, which is

8    incident reports, and consistent testimony that you stay on

9    the clock and you complete them.  You take as long as you

10    need to take because they're considered more urgent.

11           THE COURT:  And you stay on the clock for that,

12    and you get paid for that?

13           My reading of this is you get paid for that.

14           MS. DACRE:  Yes.

15           THE COURT:  That seems to me, as long as we're

16    paying you for those incident reports, it takes the donning

17    and doffing issue and makes it quite *de minimus*, if there is

18    an issue there.  So it doesn't seem to be an unfair

19    practice, in a sense.

20           MS. DACRE:  So my final comments were -- back to

21    the meal period claim.

22           Your Honor, we did read, of course, of the *Avilez*

23    opinion, in which you were dealing with security officers.

24    We believe that's where the similarity ends.  And you wrote

25    the opinion.  But the *Avilez* case turned on the fact that

1    the -- um, there was an on-the-job meal period at issue, and

2    there was an argument that the nature -- the work didn't

3    justify an on-the-job meal period.

4              THE COURT:  Right.

5              MS. DACRE:  They just shouldn't have had that

6    arrangement.  We don't take the position that we had that

7    arrangement.  We take the position that our officers were

8    subject to call.  And we're back to that distinction between

9    compensable time, which we acknowledged and paid for, and

10   on-duty time, which gives us our meal period problem, if

11   that's what was happening, and which we absolutely deny was.

12             And the DLSC says that calls for highly

13   fact-intensive individualized inquiry.  So our position

14   remains:  How can you certify that?

15             Based on the DLSC's position on it, multiple

16   letters -- um, it -- to the extent we're concerned about the

17   "free to leave the premises" part, with all deference to the

18   California Supreme Court -- I appreciated the *Brinker*

19   opinion myself -- however, it did add that element which was

20   not at issue before it in that case.  And as we all know --

21   we waited years for that case, and it was briefed from here

22   to Sunday, every final tiny issue, with amicus and all the

23   rest -- and that issue was not touched upon for the very

24   clear reason that it was not before the court.

25             There is no supporting authority besides

1    historical DLSC discussion of different statutes that

2    employees who are required to be on the premises must be on

3    duty.  There's nothing like that.  But there is the

4    opposite.  There is DLSC wage orders that talk about if

5    you -- if people have to stay on the premises, you make sure

6    they have a suitable place to sit, et cetera, et cetera,

7    which contemplates -- sometimes employees are required to

8    stay on the premises.

10:41   9         So, number one, there's no clear authority that

10        "on the premises" means you're on duty.

10:41  11         Number two, there's not clear, consistent evidence

12        in this record that people did have to stay on the premises.

13        There are people from Fashion Island --

10:41  14              THE COURT:  And if they did, for instance, they

15        got paid?

10:41  16              MS. DACRE:  Right.  But we're talking about meal

17        breaks.  I'm talking about -- I'm taking about the meal

18        break issue.

10:41  19              You'll hear that plaintiffs -- the named

20        plaintiffs from Fashion Island will say they weren't allowed

21        to leave.  That doesn't tell you that it happened anywhere

22        else in terms of certifying a California-wide class, and

23        it's not even consistent within Fashion Island.

10:41  24              THE COURT:  Well, just a moment.

10:42  25              I thought at Fashion Island they were required to

1    stay on the premises and they were required to be subject to

2    call.  And that makes sense, by the way.  I may be having

3    a -- do they have In-N-Out Burger?

10:42   4         MS. DACRE:  I don't think they do.

10:42   5         THE COURT:  Have you been down there?

10:42   6         MS. DACRE:  I have.

10:42   7         THE COURT:  It's Boudin's.  They have a Boudin's

8    soup place down there.

10:42   9         MS. DACRE:  They might.

10:42   10        THE COURT:  Yeah, they do.  It's right there on

11   the corner.

10:42   12        Let's say I'm having soup.  Well, I might be

13   subject to that half hour break, but I'm still on call.  If

14   I get a call of a smash-and-grab robbery, et cetera, I've

15   got to respond.  So it's kind of a duality here.  It's kind

16   of I've got to be there, and we're not gonna let you walk

17   off the street and go across the street to Carl's.  You've

18   got to be on the premises.  And that makes sense as a

19   policy.

10:42   20        So why aren't we going to pay 'em?  Why aren't we

21   going to pay 'em that extra half hour?

10:42   22        MS. DACRE:  We do pay them.  That's the point.

23   That's where it distinguishes from recognizing it as

24   compensable time and paying them.  You don't make them clock

25   out and lose that half hour and actually having a meal break

|   |   |   |
|---|---|---|
| | 1 | violation because you didn't relieve 'em of duty. |
| 10:43 | 2 | Officers testify -- even the plaintiffs -- some of |
| | 3 | the plaintiffs said they could go to their car -- and leave |
| | 4 | and go to their car.  They're not -- they're not on duty. |
| | 5 | They're doing what they want to do.  But they're on call, |
| | 6 | meaning, if they get contacted, there's a potential they |
| | 7 | could have to come in, and -- and that's a potential. |
| 10:43 | 8 | THE COURT:  Okay. |
| 10:43 | 9 | MS. DACRE:  So the question is, does that make a |
| | 10 | meal period violation every day, every one of those. |
| 10:43 | 11 | THE COURT:  Just let me restate it back to you.  I |
| | 12 | can actually leave.  I can go someplace in the |
| | 13 | establishment.  And because I'm on call, why am I subject to |
| | 14 | being paid?  In other words, I've got my half hour.  If I |
| | 15 | don't get called, why should I receive that additional |
| | 16 | benefit? |
| 10:43 | 17 | MS. DACRE:  Right. |
| 10:43 | 18 | THE COURT:  What happens if I do get called? |
| 10:43 | 19 | MS. DACRE:  I'm sorry? |
| 10:44 | 20 | THE COURT:  What happens if I do get called?  I |
| | 21 | get an emergency and I have to respond during my lunch hour. |
| 10:44 | 22 | MS. DACRE:  That's right. |
| 10:44 | 23 | THE COURT:  What happens? |
| 10:44 | 24 | MS. DACRE:  You have to respond. |
| 10:44 | 25 | THE COURT:  Do I get paid? |

Case 8:12-cv-00088-DOC-RNB  Document 61  Filed 01/10/13  Page 59 of 71  Page ID #:1781
SACV 12-0088 DOC - 11/5/2012 - Item No. 3

59

10:44   1           MS. DACRE:  Well, you're already being paid.

10:44   2           THE COURT:  No, I'm not.

10:44   3           MS. DACRE:  No, you are.  I'm sorry.

10:44   4           THE COURT:  No, I'm not.

10:44   5           MS. DACRE:  Gotta make this clear.

10:44   6           While they're subject to being called and on a

        7   break and gone away and eating, they're getting paid during

        8   that time.  They are getting paid.

10:44   9           And reason -- Your Honor asked me, "What's the

        10  reason we pay them of they're free to have their lunch?"

        11  Because the DLSC says we have to if they're on call --

10:44   12          THE COURT:  Okay.  Let me repeat --

10:44   13          MS. DACRE:  -- even if they're not doing any work.

10:44   14          THE COURT:  You know, when I was practicing, if

        15  the silly judge had a question, I'd listen to it.

10:44   16          MS. DACRE:  Yes, Your Honor.

10:44   17          THE COURT:  Are you listening?

10:44   18          MS. DACRE:  Yes.

10:44   19          THE COURT:  Okay.  I'm going to repeat back what I

        20  think I heard:

10:44   21          Judge, after the four hours, when they take this

        22  meal and rest break for --

10:44   23          Half an hour?

10:44   24          MS. DACRE:  Yes.

10:44   25          THE COURT:  And they're getting paid during that

|   |   |   |
|---|---|---|
|       | 1  | half hour? |
| 10:44 | 2  | MS. DACRE:  Yes. |
| 10:45 | 3  | THE COURT:  And they also are getting this meal |
|       | 4  | and rest break while they're getting paid? |
| 10:45 | 5  | MS. DACRE:  Yes. |
| 10:45 | 6  | THE COURT:  Okay.  Good enough. |
| 10:45 | 7  | MS. DACRE:  Okay.  And that's what the DLSC says. |
| 10:45 | 8  | If they're on call, even if you don't interrupt |
|       | 9  | them and they don't have any duties, you still have to pay |
|       | 10 | them because they're on call.  That's compensable time, |
|       | 11 | different from meal period premiums.  Right? |
| 10:45 | 12 | So they -- then, that's their routine, and |
|       | 13 | that's -- that's the only broad rule is the "on call."  No |
|       | 14 | "on duty," just the "on call." |
| 10:45 | 15 | THE COURT:  So where aren't they getting |
|       | 16 | compensated?  When aren't they getting compensated? |
| 10:45 | 17 | MS. DACRE:  At no time are they not getting |
|       | 18 | compensated from when they clock in until they clock out and |
|       | 19 | go home. |
| 10:46 | 20 | THE COURT:  Okay.  Okay. |
| 10:46 | 21 | MS. DACRE:  Okay.  So I think I covered that, and |
|       | 22 | why we think it's, if anything, an individualized inquiry. |
| 10:46 | 23 | But just a tiny, couple of very, very small final |
|       | 24 | points. |
| 10:46 | 25 | Pablo Salcido, they said he had supervisory level |

1    authority.  He is a supervisor.  He was not a supervisor the

2    whole four-year period.  We can't do anything with him.  You

3    can't take a class member and say, "Well, we don't want you

4    because it messes up our rhythm."  He's in the class.

5    There's no real dispute about that.  It's the four-year

6    period.  It's just by payroll records.

10:46   7        And we have a declaration submitted that supports

8    he, in fact, was simply a public safety officer for a part

9    of the four-year period.  So you can exclude people who were

10   supervisors the whole four years.  That still doesn't get

11   rid of him.  He just simply is a class member.  So, if there

12   is that conflict, it's present.

10:46   13        THE COURT:  Okay.

10:47   14        MS. DACRE:  And I believe that's all I have,

15   Your Honor.

10:47   16        THE COURT:  Check with your colleague for just a

17   moment.  Make sure you've covered everything.

10:47   18        MS. DACRE:  Okay.  Thank you.  I appreciate that.

10:47   19        So, yeah, no -- no final arguments.  Just wanted

20   to clarify regarding the class description.

10:48   21        THE COURT:  Now, this is not the third round.

22   We've concluded, except for one question I have.

10:48   23        Come on back to the lectern for just a moment.

10:48   24        Defendants claim, however you view it -- off duty

25   or meal and rest breaks -- that they are paying your

1    clients.  Repeat for me, once again, how your clients are

2    not being paid.

10:48   3          MS. ZIAEE:  Your Honor, what they're doing is that

4    they're paying the employees straight time for having worked

5    through their meal and rest breaks.  The *Brinker* court has

6    drawn a distinction between payment for straight time versus

7    premium pay.  I mean, you cannot have a meal break --

10:48   8          THE COURT:  Just a moment.

10:48   9          So this is about premium pay?

10:48   10         MS. ZIAEE:  Premium pay, yes, Your Honor.

10:48   11         THE COURT:  And it's a half hour premium pay?

10:48   12         MS. ZIAEE:  It's the penalty provided for in 226.7

13    for meal and rest breaks.

10:48   14         THE COURT:  It's about a half hour premium pay?

10:49   15         MS. ZIAEE:  Yes, Your Honor.

10:49   16         THE COURT:  All right.

10:49   17         MS. ZIAEE:  Yes, Your Honor.

10:49   18         THE COURT:  Each day?

10:49   19         MS. ZIAEE:  Each day.

10:49   20         THE COURT:  Okay.  And, at least in the Southcoast

21    situation, it would be 52 employees, if my memory's correct.

10:49   22         MS. ZIAEE:  51.  Yes, Your Honor.

10:49   23         THE COURT:  And statewide, it would be -- I

24    forget.  1500?

10:49   25         MS. ZIAEE:  I believe so.  It's set forth in --

1    1900, Your Honor.

10:49   2              THE COURT:  1900.

10:49   3              Over what period of time?

10:49   4              MS. ZIAEE:  Four years prior to the filing of the

5    lawsuit, Your Honor.

10:49   6              THE COURT:  If you have a meal and rest period and

7    you're being paid -- in other words, if I work you four to

8    six hours, and I give you a half hour, and I pay you, why --

9    and I don't receive a call -- why do you get premium pay?

10:50  10              In other words, if they're free to leave and go

11   off the premises, why are they entitled to premium pay?

10:50  12              MS. ZIAEE:  Well, they're not free to leave and go

13   off the premises, Your Honor.

10:50  14              THE COURT:  So they're wrong about that?

10:50  15              MS. ZIAEE:  They're wrong about that.  There's

16   policies before the court identifying --

10:50  17              THE COURT:  Okay.  Now they're on the premises,

18   but they're still able to take that half hour.  You know,

19   they, in a sense, don't have to be at work, unless there's

20   an emergency.  And then they're supposed to respond in the

21   store -- or, from your view, they're always on duty.

10:50  22              MS. ZIAEE:  Always on duty.

10:50  23              THE COURT:  Always on duty.  From your point --

24   from their point, they're off the clock, in a sense, unless

25   there's an emergency.

Case 8:12-cv-00088-DOC-RNB   Document 61   Filed 01/10/13   Page 64 of 71   Page ID #:1786
SACV 12-0088 DOC – 11/5/2012 – Item No. 3

64

10:50   1          Once they're given that period of time, though, to

2     sit down -- I mean, not to be on a constant patrol, just to

3     go over and sit down in the soup place -- why do they get

4     premium pay?

10:50   5          MS. ZIAEE:  Well, because they're not receiving a

6     meal break or a rest break as required under the law.  So

7     the *Brinker* court addressed this distinction, which is

8     identified in our briefs.  You may receive a -- not

9     receive -- excuse me -- an employer may comply with the meal

10    break requirements and -- but, nonetheless, be required to

11    compensate the employee for hours worked.  These are two

12    different requirements.  So if they require that their

13    employees remain on premises and remain on duty and, um, you

14    know -- and the employee is unable to take an uninterrupted

15    meal break and remains on duty during that entire time,

16    that's a violation of 226.7.

10:51  17          And the -- the statute very clearly requires

18    premium pay, which is distinct from straight pay for hours

19    worked.

10:51  20          THE COURT:  Now, I'm in the security business.

21    And I don't really care about premium pay.  In fact, I'd

22    rather go home a half hour earlier -- similar to the

23    waitress situation.  You know, lot of waitresses wanted to

24    work through that half hour, in a sense, because the tips

25    were high.  And that's why *Brinker* really didn't examine

| | | |
|---|---|---|
| | 1 | different industries, in a sense.  It set forth a very broad |
| | 2 | policy decision. |
| 10:52 | 3 | So that bright line rule, in a sense, I think is |
| | 4 | deficient only in that a lot of industries -- especially, |
| | 5 | the security industry, from my viewpoint, really wasn't |
| | 6 | looked at, because it's a little bit different than |
| | 7 | waitressing. |
| 10:52 | 8 | So what do I do in the security industry when I |
| | 9 | say to you, "I'm supposed to work 8 hours.  You give me half |
| | 10 | an hour for lunch, but I'd rather go home at 8 hours.  I |
| | 11 | don't want to be here 8 and a half hours, total.  I just |
| | 12 | want to be here 8 hours." |
| 10:53 | 13 | "Well, Dave, you're required to take that half |
| | 14 | hour in between." |
| 10:53 | 15 | Now, how do you run a security business?  How do |
| | 16 | you run, you know, logically, security in a store or police |
| | 17 | department, literally -- but I'll take a store -- with that |
| | 18 | kind of vacillation and that kind of individuality? |
| 10:53 | 19 | So I don't quite know why I feel strongly.  In |
| | 20 | fact, you may be talking me out of my initial inclination. |
| | 21 | Why do I feel strongly about paying, sort of, the premium? |
| 10:53 | 22 | MS. ZIAEE:  Well -- |
| 10:53 | 23 | THE COURT:  Not 'cause *Brinker* says it.  Well, |
| | 24 | yeah.  Maybe not. |
| 10:53 | 25 | MS. ZIAEE:  It's -- well, these -- these |

 1   employees, if the nature of the work is such that the

 2   employees can agree to an on-duty meal break waiver, then

 3   the employer is relieved of the obligation to pay the

 4   premium pay.

10:54  5        We don't have any evidence here that the nature of

 6   work defense applies.  And as Your Honor ruled in *Avilez*,

 7   that is an affirmative defense that would be addressed on

 8   the merits down the line.  It's not an issue on

 9   certification.

10:54  10        So, yes, if the nature of work defense applies,

11   and they do obtain on-duty meal break waivers from

12   employees -- if that applies, then the employer's obligation

13   is only to pay straight pay.  That's it.  No premium pay.

10:54  14        However, if you do not fall within that narrow

15   exception to the Labor Code, then you're obligated to pay

16   for straight pay if the employee does, in fact, work; and

17   you're obligated to pay the premium pay if they don't

18   receive the break.  And it's -- it's just -- it's how the

19   legislature has structured the statute.

10:54  20        THE COURT:  It's interesting, because in the Ninth

21   Circuit and in the Central District and in California, you

22   may have the better part of the argument.  In Utah or the

23   State of Washington, you wouldn't.  This issue hasn't been

24   federalized; in other words, it's really the federal courts

25   stepping in and interpreting state law, in a sense.

10:55    1          The lawsuit is really, in a sense -- and I'm happy

    2    to have you here -- in the wrong forum.  In other words, I'm

    3    used to dealing with federalized issues that sweep across

    4    the country with some uniformity.  But I could take the very

    5    ruling on *Avilez* and, if I was sitting in the state of

    6    Washington or over in Utah, I would have a completely

    7    different take on what I ruled in *Avilez*.  And that seems a

    8    little strange that these issues are constantly coming

    9    before the federal court for decision.

10:55   10          Of course, now you'd prefer to be back in state

   11    court, I think, if you had your druthers, because there

   12    you'd have a much more favorable -- California is very

   13    employee-oriented; Central District seems to be and the

   14    Ninth Circuit is.  You're in the right circuit.

10:55   15          In the Fourth Circuit, I don't think you'd be

   16    faring quite as well.  And certainly not the Fifth.

10:56   17          Well, I want to thank both of you.  If I need you,

   18    I'll call you.  Don't call me.  Don't communicate with me

   19    from this point forward.  I don't need any additional

   20    briefing.

10:56   21          Except I want to pay the courtesy to your

   22    co-counsel now.  I've asked them a few questions.

10:56   23          Counsel, be seated.

10:56   24          Anything that you want to respond? -- only on that

   25    subject.

SACV 12-0088 DOC - 11/5/2012 - Item No. 3

68

| | |
|---|---|
| 10:56 | 1 |
| 10:56 | 2 |
| | 3 |
| 10:56 | 4 |
| | 5 |
| 10:56 | 6 |
| 10:56 | 7 |
| | 8 |

MS. DACRE:  Only on?

THE COURT:  Only on what I've inquired about:

Meal and rest breaks.

MS. DACRE:  Yeah.  I think Court's just raising

issue about what's the practical solution here.

THE COURT:  Yeah.

MS. DACRE:  We are not taking -- again, to

distinguish in *Avilez* -- the position that this is an

on-duty meal period break.  But if that was what we went

back to, where would this industry be?  Because you can get

them, but then -- I'm sure you're aware -- there are a

number of opinions, besides your own, out of your own

district, that say that's a class certification issue right

there:  Whether security guards can ever be in an on-duty

meal period position.

And so what is the answer?  The answer is, against

the spirit of *Brinker*, we tell these guys, "You have to go

back to the standard meal break," which means stay -- stay

eight and a half hours, instead of eight, and don't get

paid, "but we will let you go -- we will let you go ahead

and let you cross the street."

I mean, in terms of the spirit, it doesn't make

any sense.  In terms of what we did here, we think we

followed the letter of the law and relieved these people.

THE COURT:  So what I'm hearing here is, either

```
  1   way, you're kind of getting stuck.  I mean, that's a poor
  2   legal ruling, but...
  3               MS. DACRE:  I think the distinction is -- here, is
  4   that we paid them.  There's not a violation.
  5               THE COURT:  When in Avilez, they didn't.
  6               MS. DACRE:  Right.
  7               THE COURT:  Yeah.  Yeah.
  8               All right.  I want to thank you.
  9               Well, Counsel, please.  Go ahead.  One more -- but
 10   this is brief now.  Okay?  This is very brief.
 11               MS. KANI:  I just want to point out to the Court
 12   that Avilez actually is distinguishable.  But this case goes
 13   further than Avilez, because in Avilez there was no policy
 14   that said on its face you're all on-call.  Instead, there
 15   was a series of "meal and duty" meal-break agreements, where
 16   the guys actually signed it.
 17               THE COURT:  Okay.
 18               Counsel, now you get the last word.  Okay?  Just
 19   as brief, though.  All right?  It'll even this out.  One for
 20   each.  Anything else?  But just as brief.  Now we're coming
 21   to an end.
 22               MS. DACRE:  We agree, it's distinguishable that
 23   way.
 24               THE COURT:  Okay.  Thank you.
 25               All right.  Thank you very much.  We'll contact
```

SACV 12-0088 DOC – 11/5/2012 – Item No. 3

70

1    you.

10:58    2              MS. KANI:  Thank you, Your Honor.

10:58    3              MS. ZIAEE:  Thank you.

10:58    4              MS. DACRE:  Thank you, Your Honor.

10:58    5         *(Proceedings adjourned at 10:58 a.m..)*

10:58    6                        -oOo-

10:58    7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

DEBBIE GALE, U.S. COURT REPORTER

-oOo-


CERTIFICATE


        I hereby certify that pursuant to Section 753,

Title 28, United States Code, the foregoing is a true and

correct transcript of the stenographically reported

proceedings held in the above-entitled matter and that the

transcript page format is in conformance with the

regulations of the Judicial Conference of the United States.


Date:  January 8, 2013



                        /s/ Debbie Gale
                        _____
                        DEBBIE GALE, U.S. COURT REPORTER
                        CSR NO. 9472, RPR, CCRR